# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DARRELL GILMORE, *et. al.*,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 17-cv-1046 (TSC) |
| ) | |
| **THE DISTRICT OF COLUMBIA, *et al.*,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Darrell Gilmore and five of his children allege negligent infliction of emotional distress, negligent supervision and training, and Fourth Amendment violations against Defendant Metropolitan Police Department ("MPD") officers Darin Booher, Earl Delauder, Christopher Dorsey, unknown police officers, and the District of Columbia. These claims arise from Defendants' execution of a search warrant at Plaintiffs' home on January 27, 2016.

Plaintiffs' evidence regarding the execution of the search—including testimony that officers pointed their weapons at the heads of Gilmore and his children, and made Gilmore appear naked in front of his children—is deeply troubling. Nonetheless, for the reasons set forth below, Defendants' motion for summary judgment, ECF No. 59, will be GRANTED in part and DENIED in part.

# I.    BACKGROUND

There are few factual disputes regarding the events leading up to the execution of the search warrant, but the parties tell divergent versions of what transpired afterwards.[1]

## A.    Robbery of MAPCS's Students and the Investigation

On January 14, 2016, two students (complainants 1 ("C-1") and 2 ("C-2")) from the Maya Angelou Public Charter School ("MAPCS") were robbed at gunpoint by a masked individual.  Defs. Statement of Material Facts ("SOMF"), ECF No. 59-2 ¶ 1.

The police were called, and an MPD detective responded and interviewed the students. *Id*. ¶ 5.  C-2 told the detective that he believed the robber was another MAPCS student who used the alias "Mo-Mo."  *Id*. ¶¶ 6–7.  The case was then assigned to Detective Booher.  *Id*. ¶ 8.

On or about January 20, 2016, an MAPCS school official confirmed to Booher and Detective Michael Wendt that an individual known as "Mo-Mo" was a student at the school.  *Id*. ¶ 9.  The employee also told them that Mo-Mo's real name is Eric Smith and provided a photograph of him.  *Id*. ¶ 10.  Booher then re-interviewed C-2, who reported that Smith apologized to him after the robbery, saying he did not realize who the complainants were when he robbed them.  *Id*. ¶ 18–19.  Smith gave C-1's cellphone to C-2, who gave it to a teacher.  *Id*. ¶¶ 20–21.  Booher showed C-2 the photograph of Smith, and C-2 identified Smith as the robber. *Id*. ¶ 22.  Booher also obtained an MAPCS General Demographics form showing 3056 Q Street S.E. as Smith's home address.  *Id*. ¶ 11; Defs. Ex. 3, ECF No. 59-5 at 2–3.  It was not until late

---

[1] Plaintiffs do not dispute Defendants' factual assertions in paragraphs 1–13, 15–30, 33–36, 39, 45–52, 55–58, 61, 63, ,68, 72, 75–76, 80–89, 92–93, 95–100, 108, 110 of their Statement of Material Facts, ECF No. 59-2.  *See* Pls. SOMF, ECF No. 67-1 at 1; *see also* Oral Argument on Defs. Motion for Summary Judgment, 05/24/2023 (Plaintiffs' counsel asserting that paragraph 14 of Defendants' Statement of Material Facts is also disputed).

February 2016 that MAPCS learned that Eric Smith no longer lived at the Q Street address. Defs. SOMF ¶¶ 12–13.

Booher testified that he checked the TLO database—a TransUnion database that combines approximately 10,000 other databases—to confirm Smith's home address. *Id*. ¶¶ 14–17; Defs. Ex. 2, ECF No. 59-4 62:20–63:12. He also drove by the Q Street address to obtain a description of the house for his search warrant affidavit. Defs. SOMF ¶ 24. Booher then completed the search warrant affidavit for 3056 Q Street S.E. and submitted it to Sergeant Dorsey for review and approval. *Id*. ¶ 26. After Dorsey approved it, Assistant United States Attorney ("AUSA") Jennifer Kerkhoff also reviewed and signed the affidavit. *Id*. ¶¶ 26–27; Defs. Ex.1, ECF No. 59-3 at 3. In the probable cause section of the affidavit, Booher used the last name "Brown" when referring to Smith and Smith's mother, but otherwise referred to him as "Smith" throughout the affidavit. Defs. Ex.1, ECF No. 59-3 at 1–3.

On January 21, 2016, D.C. Superior Court Judge Wertheim authorized the search warrant for 3056 Q Street S.E., to occur "*at any time of the day or night*" within the next ten days. *Id*. at 2 (emphasis in original). MPD officers were authorized to search and seize "Firearms, Ammunition, photographs of ammunition, electronic devices which may contain photographs of firearms." *Id*.

Before executing the search warrant, MPD Officer Singletary verified the address by performing a "reverse search" in the TLO database—he used the Q street address as the search term and TLO confirmed that Princess Smith, Eric's mother, lived there. Defs. SOMF ¶¶ 33–34. Booher also briefed the officers who would be executing the search warrant about the nature of the warrant, the items to be seized, and told them that there was probable cause for Smith's arrest. *Id*. ¶¶ 57–58.

**B.      Execution of the Search Warrant**

In January 2016, the Gilmore family lived at 3056 Q Street S.E—not Eric or Princess Smith.  Defendants executed the search warrant at that address at 7:24 am on January 27, 2016. *Id*. ¶ 36.  An MPD officer knocked on the door, someone inside opened the door, and Gilmore was standing naked in the doorway and covered with shaving cream.  *Id*. ¶¶ 37, 39, 60; Pls. SOMF at 2.  Booher and Dorsey entered through the front door, while Delauder and Stallings secured the back of the house.  Defs. SOMF ¶¶ 75, 76; Pls. SOMF at 7.

The parties tell conflicting versions of what happened next.

Defendants claim Booher and Dorsey entered the home with their weapons in the "tuck ready" position—holding their gun in the middle of their chest with the gun pointed towards the ground.  Defs. Ex. 2 at 119:15–121:9; *see* Defs. Ex. 7., ECF No. 59-9 at 2.  Booher went to the lower level, encountered a female in her late teens or early twenties, and brought her upstairs. *See* Defs. Ex. 2 at 112:16-20, 113:12-16.  Once the whole family was upstairs, Booher holstered his gun and spoke with Denise, Gilmore's aunt.  *See id*. 50:22–51:4, 109:1-14, 119:5-10.  Denise identified all the family members, viewed a picture of Smith that Booher provided, and said that Smith did not live in the home.  *See id*.  50:22–51:4, 109:1-17.  Booher then spoke to Gilmore's son, who also identified everyone in the home and said that Smith did not live there.  *See id*. at 109:17–110:2.  Booher and Dorsey eventually spoke with Gilmore, who was by then seated in the kitchen with a towel wrapped around him, and Gilmore also told them that Smith did not live there.  *See id*. 110:2–11, 111:10-12.  Eventually, Dorsey and Booher concluded that Smith was not at the home, and Dorsey directed the officers to leave.  *See id*. 118:5-9.  Defendants claim that while the officers were in the home, Gilmore and the "older" residents were "yelling" at them and "using profanity."  *See id*. 115:9-12.

According to Plaintiffs, Booher and Dorsey entered the home with their guns drawn and immediately pointed their weapons at Plaintiffs' heads. *See* Pls. SOMF at 3, 7, 10, 12–13; Pls. Ex. 6, ECF No. 67-3 at 12 (Gilmore testified that "[MPD officers] put AR-15's and .40 caliber weapons to his children's head looking for Eric Smith"). Booher and other officers proceeded to the lower level of the home, entered his daughters' bedrooms, pointed guns at them, and told them to go upstairs. *See* Pls. SOMF at 5–6, 15; Pls. Ex. 23, ECF No. 67-5 at 56:1-4 (One daughter testified that an officer held a gun to her head "[a]ll the way from until we got upstairs, all the way to the living room. And then [the officer] pushed us against the wall. And then that's when he removed the gun."). Other officers, including Dorsey, pointed guns at Gilmore and several of his children, handcuffed Gilmore and at least one of his children, and gathered them all in the living room. *See* Pls. SOMF at 8, 10–13; Pls. Ex. 13, ECF No. 67-4 at 28 (Gilmore testified that "[Dorsey] and other officers pointed . . . guns at me and my children and handcuffed me and my children, including my 9 year old son . . . My children were also moved at gun point to a location in the living room."); Pls. Ex. 4, ECF No. 67-3 at 6 (Dorsey testified that "Detective Solgat . . . was handcuffing the naked middle aged man then asked me for an additional handcuff due to the man's heavy build. I complied and provided Detective Solgat with the handcuffs."). Plaintiffs also claim that the search lasted twenty to twenty-five minutes, during which Defendants damaged and destroyed certain items in their home, including doors, walls, and family pictures. *See* Pls. SOMF at 14–15; Defs. Ex. 11, ECF No. 59-13 at 33:8-16. Defs. Ex. 12, ECF No. 59-14 at 66:16-21.

## C.   MPD General Orders

MPD General Orders require officers "to abide by all Constitutional requirements when conducting searches and when obtaining and serving criminal search warrants," and MPD has

established certain procedures governing searches.  MPD General Order 702.03, ECF No. 67-7 at 2, 4–20.  When applying for a written search warrant, officers are required to "draft a PD Form 274 (Affidavit in Support of an Application for Search Warrant) or an affidavit consistent with a PD Form 274."  *Id*. at 4–5.  Then, the affiant is required to "hold a pre-warrant conference" with "the official the rank of lieutenant or above in charge of the member's unit" "to determine whether there is probable cause to support the search warrant."  *Id*. at 5.  The reviewing officer will then "certify the PF Form 273 (Record of Review of Affidavit)" by affixing their signature to PD Forms 273 and 274.  *Id*. at 7.  Next, the affiant must contact the Case Explorer Coordinator for event de-confliction to ensure that there are no other police operations occurring at the location.  *Id*.  All forms are then submitted to a prosecutor for review. *Id*.

## II.    LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one that "might affect the outcome of the suit," and "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  *Id*. at 248, 250.

In ruling on a motion for summary judgment, the court must draw all reasonable inferences in the nonmoving party's favor.  *Id*. at 255.  However, a nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of their position. *Id*. at 252.  To prevail on a motion for summary judgment, the moving party must show that the

nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322.  "[A] court must independently evaluate the motion" and grant it only

if "whatever is before the district court demonstrates that the standard for the entry of summary

judgment . . . is satisfied."  *Id.* at 323; Fed. R. Civ. P. 56(a).  "[E]ven where a summary judgment

motion is unopposed," the court may nonetheless "only . . . grant[] when the movant has met its

burden" under Rule 56.  *Alexander v. FBI*, 691 F. Supp. 2d 182, 193 (D.D.C. 2010) (citations

omitted).

### III.    ANALYSIS

### A.    Fourth Amendment Claims (Counts IV and V)

Defendants first argue that Plaintiffs' false arrest/imprisonment and unlawful entry claims

must be dismissed because they are brought pursuant to the Fifth Amendment, when the

appropriate constitutional provision for such claims is the Fourth Amendment.  *See* Defs. Mem.,

ECF 59-1 at 30 (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994) and *Elkins v. District of

Columbia*, 690 F.3d 554, 560–62 (D.C. Cir. 2012)).  However, since Counts IV and V rely on

both the Fourth and Fifth Amendments, Defendants' argument is unavailing.  *See* Third Am.

Compl., ECF No. 38-1 ¶¶ 72–73, 76.

Next, Defendants argue that Plaintiffs' constitutional claims against Defendant officers

must be dismissed as a matter of law because the officers' entry into and search of the Gilmore

home was based on a valid warrant, supported by probable cause.  *See* ECF No. 59-1 at 36.

Plaintiffs counter that the validity of the search warrant cannot be decided because there are

"genuine fact disputes regarding whether . . . Booher recklessly falsified the subject affidavit,"

given that he testified to conducting a database search that confirmed Smith's address but there is

no documentary record of the search.  ECF No. 67 at 24–26.  Plaintiffs also argue that they are

due an adverse inference or a spoliation of evidence ruling because Defendants have not

produced any record of Booher's database search—principally the "printout" that he claims to

have preserved in his case file.  ECF No. 67 at 13, 15–17; *see also* Pls. Ex. 22, ECF No. 67-5 at

32 (Booher testifying that he conducted a TLO database search and stored the printed search

document his case file).

Although Plaintiffs cite no legal precedent establishing that the absence of documentary

evidence of Booher's TLO search is enough to warrant an inference that Booher knowingly or

recklessly included a false statement in his affidavit, the court will nevertheless assess the legal

validity of the search warrant because Plaintiffs' constitutional claims largely turn on whether

the search warrant is valid.

"At the core" of the Fourth Amendment's protections is the right of a person "to retreat

into his own home and there to be free from unreasonable governmental intrusion."  *Silverman v.

United States*, 365 U.S. 505, 511 (1961).  The Fourth Amendment generally prohibits "searches

and seizures inside a home without a [valid] warrant," *Groh v. Ramirez*, 540 U.S. 551, 558–59

(2004), based "upon probable cause, supported by [o]ath or affirmation . . . particularly

describing the place to be searched, and the persons or things to be seized."  U.S. Const., amend.

IV.

A search warrant may be invalid "if the magistrate or judge in issuing a warrant was

misled [with respect to a material fact] by information in an affidavit that the affiant knew was

false or would have known was false except for his reckless disregard of the truth."  *United

States v. Leon*, 468 U.S. 897, 922–23 (1984) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

A plaintiff challenging a search warrant's validity must show that the affidavit contains "a

deliberately or recklessly false statement," *Franks*, 438 U.S. at 165, and the false statement was

material such that when it is "set to one side, the affidavit's remaining content is insufficient to establish probable cause," *id*. at 156.  *See United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir. 2016).  In other words, the court must "construct a hypothetical affidavit that omits the false statements and then must ask whether the remaining portions of the affidavit would have been sufficient 'to establish probable cause.'"  *S.H. v. District of Columbia*, 270 F. Supp. 3d 260, 273 (D.D.C. 2017) (quoting *Franks*, 438 U.S. at 156).

In *S.H.*, the plaintiff alleged, and the court accepted as true, that the officer's affidavit in support of the search warrant contained numerous false statements—including that the suspect identified his address to officers, that the suspect had a "utility listing" at the address, and that the affiant's "experience and knowledge" supported his belief regarding what items would be found at the address—and material omissions, such that there was "no 'reasonable cause to believe that the specific things to be searched for and seized were located on the property to which entry was sought.'"  270 F. Supp. 3d at 273–78 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)) (cleaned up).

Here, the application for the search warrant was based on Booher's affidavit declaring that he (1) "conducted a check with the School of Maya Angelou Public Charter School confirming the address of the Eric Brown . . . in the listed case as 3056 Q Street Southeast," and (2) "conducted a database query which revealed the address of Eric Brown's mother as residing at the [Q Street] address."  Defs. Ex. 1 at 2–3.  Defendants argue that the two references to "Brown" instead of "Smith" were typographical errors that do not demonstrate reckless or deliberate falsity, given that there are three other references in the affidavit to "Smith," and they further argue that whether Booher conducted the TLO database search is immaterial to the

probable cause assessment under *Franks* because MAPCS's confirmation that Smith lived at the Q street address is sufficient to establish probable cause.  *See* ECF No. 59-1 at 38–39.

    As the Supreme Court has instructed, the court begins by excising the challenged statement—that Booher "conducted a database query which revealed the address of Eric Brown's mother as residing at the [Q Street] address," Defs. Ex. 1 at 2–3—from the search warrant affidavit.  *See Franks*, 438 U.S. at 171–72.  But because there is no evidence that the two references to Brown instead of Smith amount to anything more than "negligence," this error does not affect the court's *Franks* analysis.  *See Andreen v. Lanier*, 582 F. Supp. 2d 48, 50 (D.D.C. 2008) ("'[a]llegations of negligence or innocent mistake are insufficient' to satisfy the *Franks* test which requires intentional or reckless disregard for the truth." (quoting *Franks*, 438 U.S. at 171)).  Thus, absent the challenged statement, the search warrant would rely on the following statement for probable cause to search the Q Street address: Booher "conducted a check with the School of Maya Angelou Public Charter School confirming the address of the Eric Brown . . . in the listed case as 3056 Q Street Southeast."  Defs. Ex. 1 at 2.

    The court finds that this "remaining content" in Booher's affidavit was "sufficient to establish probable cause."  *Franks*, 438 U.S. at 156.  MPD was searching for Smith—a high school student who was the prime suspect in the armed robbery of two other high school students.  Smith, who attended the same school as the victims, was identified by one of them as the robber, and a MAPCS official provided investigators with Smith's address.  Even if Defendant officers had not performed a corroborating database search, the school's confirmation that Smith lived at the Q Street address would have been enough to establish probable cause to secure a search warrant for the premises.  *Cf. United States v. Cote*, 569 F.3d 391, 392–93 (8th Cir. 2009) (finding that a search warrant for a student's home "did not violate the Fourth

Amendment" where the affiant testified at a preliminary hearing that he obtained the student's address from the school principal).

The court also notes that Officer Singletary searched the TLO database before the search warrant was executed and confirmed that Smith's mother lived at the address.  Defs. SOMF ¶¶ 33–34.  This fact—which Plaintiffs do not challenge—undermines Plaintiffs' contention that the officers recklessly or intentionally included incorrect information regarding who lived at the home when they sought the search warrant.

1. *Fourth Amendment Claims Against Defendant Officers and their Qualified Immunity Defenses*

Plaintiffs assert two Fourth Amendment claims against Defendant officers: false arrest/imprisonment (Count IV), and unlawful entry (Count V).  Defendants argue that both claims should be dismissed because (1) Defendant officers are entitled to qualified immunity, (2) they acted pursuant to a valid search warrant, and (3) "[a] brief detention of residents during the execution of a valid search warrant is not an arrest under the Fourth Amendment."  Defs. Mot. at 36–39 (citing *United States v. Brinson-Scott*, 714 F.3d 606, 624 (D.C. Cir. 2013)).

Qualified immunity protects "all but the plainly incompetent [government officials] or those who knowingly violate the law" "from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known."  *City of Tahlequah, Oklahoma v. Bond*, 142 S.Ct. 9, 11 (2021) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018)).  Whether an official is entitled to qualified immunity turns on two questions: (1) whether the official "violated a federal statutory or constitutional right," and (2) whether "the unlawfulness of their conduct was clearly established at the time."  *Wesby*, 138 S.Ct. at 589 (quotation marks and citation omitted).

To defeat a qualified immunity defense on an unlawful entry claim, Plaintiffs must not only "prove that the warrant was invalid.  They must also show that the flaws were so 'obvious that no reasonably competent officer would have concluded that a warrant should have issued.'" *S.H.*, 270 F. Supp. 3d at 271 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (cleaned up)). Plaintiffs cannot do so on this record.  Moreover, Plaintiffs conceded at oral argument that if the court were to find the search warrant valid, the officers would be entitled to qualified immunity on both Fourth Amendment claims.[2]  Therefore, based on the court's finding that the warrant was valid, *see* supra III.A, Booher and Dorsey are entitled to qualified immunity on Count V.

Plaintiffs' Fourth Amendment false arrest/imprisonment claim fails for substantially the same reasons.  Generally, law enforcement's "seizure" of a person is only reasonable if the officers "have particular suspicion that [the individual] is involved in criminal activity or poses a specific danger." *Bailey v. United States*, 568 U.S. 186, 193 (2013).  But officers executing a search warrant may "detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981).  "Rather than requiring particularized suspicion, *Summers*'s rule 'is categorical'—if a person is present while officers search a premises pursuant to a valid warrant, the officers will have constitutional authority to detain that person." *S.H.*, 270 F. Supp. 3d at 290 (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)).

To prevail on a false arrest/imprisonment claim, Plaintiffs must show that their arrests were "objectively unreasonable because there was no probable cause to arrest [them] (i.e., that [their] arrest[s] violated the Fourth Amendment)," and to defeat Defendant officers' qualified immunity defense they must show that "established law so clearly precluded a reasonable officer

---

[2] Plaintiffs conceded that Delauder is entitled to qualified immunity on the Fourth Amendment unlawful entry and false arrest/imprisonment claims because he never entered Plaintiffs' home. Consequently, Plaintiffs' claims against him will be dismissed.

from believing that he had probable cause" to detain them in these circumstances. *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 396 (D.D.C. 2016). But given that the officers were entitled to detain the home's occupants pursuant to their execution of a valid search warrant, Plaintiffs cannot show that Defendant officers lacked probable cause to detain them. *See Muehler*, 544 U.S. at 98. Consequently, the court will dismiss Count IV against Defendant officers.

But that is not the end of the inquiry. Even though an officer has a right to detain a home's occupants while executing a search, the "duration of a detention," or the use of force used to effectuate it, may give rise to a Fourth Amendment violation. *Muehler*, 544 U.S. at 100; *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) ("As in other Fourth Amendment contexts . . . the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (citing *Scott v. United States*, 436 U.S. 128, 137–139 (1978))). Again, the district court's decision in *S.H.* is illustrative. There, the court determined that although *Summers* permitted officers to detain plaintiffs "in a reasonable manner while the[y] conducted the search," allegations regarding the duration of handcuffing and that officers pointed loaded weapons at naked children gave rise to an excessive force claim. 270 F. Supp. 3d at 291–94.

The parties dispute whether Booher and Dorsey (1) pointed their guns at Plaintiffs' heads; (2) forced Gilmore to remain naked, while handcuffed, in front of his children; and (3) destroyed doors, walls, and family pictures within the home, as well as the length of the duration of the detainment. *See* Pls. Ex. 6, ECF No. 67-3 at 12; Pls. Ex. 23, ECF No. 67-5 at 56:1-4; Defs. Ex. 11, ECF No. 59-13 at 33:8-16. While these disputes are not material to Plaintiffs' false arrest/imprisonment claim, they would be relevant had Plaintiffs brought an excessive force claim—alleging that Defendant officers' use of force was unreasonable.

Under Federal Rule of Civil Procedure 15(a)(2), the court may *sua sponte* grant a party leave to amend their pleadings before trial when justice so requires.  *See Montgomery v. McDonough*, No. CV 22-1715 (RC), 2023 WL 4253490, at *11 (D.D.C. June 29, 2023) (granting plaintiff leave to amend her complaint *sua sponte*).  Here, there are genuine disputes of material fact which might permit a fact finder to conclude that although Defendant officers could lawfully detain Plaintiffs pursuant to the search warrant, they nonetheless used unreasonable force in doing so.  Further, the court finds that allowing Plaintiffs leave to amend their complaint would cause minimal prejudice or inconvenience to Defendants because no trial date has been set, and there is still ample time to prepare a defense.

## 2.   *Fourth Amendment Claims Against the District*

A plaintiff may establish municipal liability on a Section 1983 claim if they can show that a government policy or custom was the "moving force" behind the alleged constitutional injury.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91, 694 (1978).  A plaintiff must show (1) "a predicate constitutional violation," and (2) "that a custom or policy of the municipality caused the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  A municipal custom or policy can be established in one of four ways: (1) "the explicit setting of a policy by the government," (2) "the action of a policy maker within the government," (3) "adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" and (4) "failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  *Id.* (internal citations omitted).

Under the "knowing failure to act" and "deliberate indifference" theories, a plaintiff must show that a policy maker had actual or constructive knowledge of the risk of constitutional violations. *Id.* at 1306–07. A policymaker is someone who, under state law, has the "[a]uthority to make municipal policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 118–19 (1988). To survive summary judgment, a plaintiff must offer evidence of "concentrated, fully packed, precisely delineated scenarios" to establish that an unconstitutional policy or custom existed. *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (citation omitted).

Defendants argue that Plaintiffs' *Monell* claims must be dismissed because (1) there is no evidence that the "police officers were poorly trained as to securing and executing search warrants," (2) there is no record evidence that a policymaker was deliberately indifferent to such a need, and (3) Plaintiffs did not allege facts in their Third Amended Complaint to support any other theory of *Monell* liability. ECF No. 59 at 33–35; *see* ECF No. 69 at 9. Plaintiffs counter that testimony from Lieutenants Habeebullah and Davis is sufficient to support their *Monell* claims against the District based on either of two theories: a knowing failure to act or deliberate indifference to the risk of constitutional violations. *See* Pls. Opp'n at 18–22. The court disagrees.

As an initial matter, Plaintiffs' *Monell* claims fail because they cannot establish that Defendants committed a predicate constitutional violation. As explained above, Plaintiffs' Fourth Amendment unlawful entry and false arrest/imprisonment claims will be dismissed. *See* Supra III.A.1–2. Consequently, Plaintiffs cannot establish that the District has a policy or custom that was the "moving force" behind a Fourth Amendment injury because they have not established a Fourth Amendment violation. *See Baker*, 326 F.3d at 1306.

Moreover, even if Plaintiffs could show a predicate Fourth Amendment violation, there is no evidence in the record that a policymaker had actual or constructive knowledge of the risk of any constitutional violations.  *See id.*  at 1306–07; *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (holding that a deliberate indifference claim requires evidence that a policymaker knew or should have known that their agents would "probably violate constitutional rights.").

Plaintiffs proffer the testimony of Lieutenant Habeebullah, who testified that "we have not used" "PD Form 273" "in many, many years."  Pls. Opp'n, ECF No. 67 at 9, 20 (quoting Pls. Ex. 40, ECF No. 69-7 at 27:7-16).  They argue that Lieutenant Habeebullah's testimony raises a genuine issue of material fact as to whether the District knew or should have known that officers would likely violate constitutional rights when executing a search warrant.  Pls. Opp'n at 21–22. It does not.

But Lieutenant Habeebullah testified that although officers in her district have not been using the PD Form 273 when obtaining a search warrant, reviewing officers are nonetheless required to review an affidavit in support of a warrant and attest to that review in writing.  *See* Pls. Ex. 40, ECF No. 69-7 27:17–28:3.  The fact that officers in the Seventh District were not using PD Form 273 does not, without more, establish that officers were likely to violate citizens' Fourth Amendment rights, and, moreover, there is no evidence that a policymaker was aware of this practice.  The Fourth Amendment protects the right to be free from search and seizure that is not supported by probable cause.  Plaintiffs have not demonstrated that the failure to log a warrant affidavit on a particular form—after review—rendered the warrant deficient or negated probable cause.  Moreover, it is undisputed that Dorsey and AUSA Kerkhoff reviewed and approved the affidavit before it was submitted to the judge.  *See* Defs. SOMF ¶¶ 26–27.

Plaintiffs also proffer the testimony of Lieutenant Davis, who was asked: "When there is a search of a house with the wrong address, does the [MPD] as a policy and practice conduct an investigation?"  He responded: "No, [t]here has to be negligence that is immediately noticed in order for the Department to launch an investigation."  Pls. Ex. 31, ECF No. 67-6 at 33.  Plaintiffs argue that Lieutenant Davis' testimony "reveals an unchecked level of self-policing" by officers and a conscious effort by MPD to remain ignorant of potential constitutional violations.

Plaintiffs' position appears to be that the District is obligated to conduct an internal investigation each time a search is conducted at the wrong address.  But the Fourth Amendment does not require that they do so.  As the D.C. Circuit has explained, the District is "not require[d] . . . to take reasonable care to discover and prevent constitutional violations."  *Warren*, 353 F.3d at 39.  Instead, the deliberate indifference theory "means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction."  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).  Lieutenant Davis' testimony could allow a fact finder to find that MPD has a policy of investigating potential constitutional, statutory, or policy violations when a wrongful search immediately appears to be the result of an officer's negligence.  This evidence does not establish that policymakers had constructive knowledge of likely Fourth Amendment violations.

Because Plaintiffs cannot establish a predicate Fourth Amendment violation, and there is no genuine dispute regarding whether a policymaker had actual or constructive knowledge of the risk of any such violations, Defendants' motion for summary judgment will be granted as to the § 1983 claims against the District.

**B.**     **Negligent Supervision and Training (Count II and III)**

Plaintiffs' negligent supervision and training claims against the District, in Counts II and

III respectively, are based on the District's alleged failure to supervise and train Defendant

officers on the proper procedures for securing a search warrant, as detailed in General Order 702,

PD Forms 296A, 273, and 274.  Because Plaintiffs' negligence claims are predicated on the same

factual allegations, the court analyzes them together.  *See Hargraves v. District of Columbia*, 134

F. Supp. 3d 68, 95 (D.D.C. 2015).

"To prevail on a negligence cause of action, the plaintiff must prove, using expert

testimony on the standard of care, 'the applicable standard of care, a deviation from that standard

by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Id.*

at 95 (quoting *Hill v. Metropolitan African Methodist Episcopal Church*, 779 A.2d 906, 908

(D.C. 2001)); *see also Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (To

establish negligent supervision or training the plaintiff needs to show (1) that the "employee

behaved in a dangerous or otherwise incompetent manner," (2) the "employer knew or should

have known" of the employee's behavior, and (3) "that the employer, armed with that actual or

constructive knowledge, failed to adequately supervise the employee.").

Defendants argue that Plaintiffs' negligent supervision and training claims fail because

there is no record evidence of prior "adverse actions" or "disciplinary" history for Booher,

Dorsey, or Delauder, and Plaintiffs' expert did not opine on an applicable standard of care.  Defs.

Mot. at 26–30.  Plaintiffs did not respond to Defendants' first argument, and in response to the

second argument, Plaintiffs contend that expert opinion is not required to establish the standard

of care, and alternatively that their expert did indeed establish a national standard of care.  Pls.

Opp'n at 27–36.  These arguments are unavailing.

### 1. *Actual or Constructive Knowledge of Dangerous or Incompetent Behavior*

Plaintiffs cannot prevail on their negligent supervision or training claims without showing that the District had "actual or constructive knowledge" that either Booher, Dorsey, or Delauder had behaved in a "dangerous or otherwise incompetent manner" before the execution of the search warrant, and nevertheless failed to train or supervise them. *Brown*, 782 A.2d at 760; *see e.g.*, *Spiller v. District of Columbia*, 302 F. Supp. 3d 240, 254–55 (2018) (dismissing negligent supervision and training claims against the District where plaintiff failed to allege "'actual or constructive knowledge' of any problematic behavior on the part of the officers in question *before* the incident at issue." (emphasis in original)); *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 114–15 (D.D.C. 2011) (dismissing negligent supervision claim against the District where plaintiff failed to identify "any evidence suggesting that the [MPD] knew or should have known that [the officer] was prone to behave in a dangerous or otherwise incompetent manner").

Defendants point out that Plaintiffs did not request any information regarding whether the Defendant officers "had ever been the subject of prior substantiated complaints," did not seek "records about adverse actions or disciplinary records," "serve requests for documents upon any of the individual Defendants," depose Booher "about his employment history," or "depose or serve written discovery" on Dorsey or Delauder.  ECF No. 59 at 27–28.  They further contend that Booher has in fact been trained on how to enter a building when executing a warrant.  *See* Defs. Mot. at 28 (citing Defs. Ex. 2 at 14:12–15, 16:5–11).

At oral argument, Plaintiffs' counsel conceded that he had not sought any evidence of Defendant officers' prior disciplinary history.  And Plaintiffs have not pointed to any evidence in the record showing that the District knew or should have known that Booher, Dorsey, or

Delauder had previously behaved in a dangerous or otherwise incompetent manner.  To effectively counter Defendants' motion, Plaintiffs need to demonstrate that this issue is "genuinely disputed" by "citing to particular parts of the record . . . or showing that the materials [Defendants] cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. Pro. 56(c)(1).  Plaintiffs have made no such effort.  Consequently, the court treats Defendants' motion as conceded on this point, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014), and finds that Defendants are entitled to judgment as a matter of law on Plaintiffs' negligent supervision and training claims because there is no record evidence to establish those claims.

### 2.  *National Standard of Care and Deviation*

Plaintiffs' expert Robert Pusins did not establish an applicable standard of care and a deviation from that standard.  "To establish a national standard of care, an expert must do more than rely on his own experience or 'simply declare that the District violated the national standard of care."  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 258 (D.D.C. 2018) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001)) (cleaned up).  "The expert must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions."  *Butera*, 235 F.3d at 659 (citing *Scott v. District of Columbia*, 101 F.3d 748, 758 (D.C. Cir. 1996)).

In formulating his report, Pusins relied on (1) two International Association of Chiefs of Police ("IACP") publications: Paper on Executing Search Warrants, and a Model Policy on Executing Search Warrants, (2) MPD General Order 702.03, which establishes certain MPD procedures for obtaining search warrants and conducting searches, and (3) deposition testimony from Booher and Lieutenant Davis.  *See* ECF No. 67-8.  Pusins explained that IACP's mission

"has been to identify leading practices and provide sound guidance to law enforcement" and that its reports "are designed to accompany model policies to provide essential background and supporting documentation to provide greater understanding on the developmental philosophy and implementation requirements for the model policy." *Id.* at 7. However, he did not identify any national standard of care derived from those reports; he merely opined that "Booher deliberately chose to not conduct a complete, and proper police investigation by not confirming the proper identity of the suspect in the Probable Cause section of the application for the search warrant." *Id.* at 4–9.

Plaintiffs direct this court's attention to *Sherrod*, in which the court held that plaintiffs' expert's "reliance on certain IACP model policies" was enough to survive summary judgment because the expert "report and declaration ma[d]e clear that [the expert] concluded that the model policies were substantially similar to policies adopted by a number of law enforcement agencies throughout the United States," *Sherrod*, 334 F. Supp. at 258. But Pusins did not support his opinion in this manner. He made no comparison or reference to "policies adopted by a number of law enforcement agencies throughout the United States." *Id.* And unlike *Sherrod*, in which the expert had "consult[ed] with personnel from hundreds of law enforcement agencies," *id.* at 259, Pusins did not indicate whether he consulted with any law enforcement officers to determine a national standard. Identifying a standard is necessary so that a jury, in finding whether a defendant acted negligently, can determine whether a defendant deviated from such a standard. *See Meek v. Shepard*, 484 A.2d 579, 582 (D.C. 1984) (finding the trial court erred by sending a medical malpractice case to the jury where Plaintiff's expert had failed to identify a standard of care). Pusins identified no such standard.

Perhaps aware of their expert report's deficiencies, Plaintiffs argue that they are not required to offer expert testimony.  They cite a number of cases in which the court concluded that expert testimony was not needed to establish the applicable standard of care because the evidence showed that the officers' conduct was so egregious that the jury would not need the assistance of an expert.  *See* ECF No. 67 at 28–29 (citing *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010); *Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000); and *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009)).  For example, in *Daskalea*, 227 F.3d at 445, the Court held that "it does not take an expert to establish that the District was negligent in permitting the kind of persistent, open and notorious conduct at issue here.  Surely a juror could reasonably conclude that the District had been negligent (at best) when it failed to notice, let alone stop, a continuing series of evening stripteases, accompanied by blaring music and guard-on-inmate violence."

Here, however, the asserted negligent conduct is not so egregious that the jury would not need the assistance of an expert.  Plaintiffs allege that Booher improperly secured a search warrant by not conducting the TLO database check, and that specific supervisor officers did not review Booher's draft affidavit.  The average juror would likely have little to no familiarity with these internal procedures, and "would be forced to engage in idle speculation regarding the duty of care governing [the District] in the training [and supervision] of their employees."  *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 89–90 (D.D.C.2000).  Thus, the cases cited are inapposite to this one, in which expert testimony is necessary.  *See Rice v. District of Columbia*, 715 F. Supp. 2d 127, 132 (D.D.C. 2010) (citing *District of Columbia v. Banks*, 646 A.2d 972, 983 (D.C. 1994) (Farrell J. concurring)) (liability on a negligence claim "only attaches if the police were negligent with regard to a national *standard of care.*" (emphasis in original)).

**C.**     **Negligent Infliction of Emotional Distress (Count I).**

Plaintiffs further claim negligent infliction of emotional distress ("NIED"), against the District, based on their allegations that "[p]olice guns were drawn and waved at the minor Plaintiffs, who were then physically moved about even though they presented no threat(s) to anyone, cooperated fully, did not engage in illegal activity, and did not resist any lawful commands.  Mr. Gilmore and members of his family, including his 9-year-old son were handcuffed."  *See* Third Am. Compl, ECF No. 38-1 ¶¶ 56–71.[3]

 "The elements of a claim for negligent infliction of emotional distress are: (1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable."  *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011). "Serious and verifiable" means that the distress must have manifested in an external condition or physical symptoms.  *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991).

Again, Defendants argue that this claim must be dismissed because Plaintiffs' expert did not establish a standard of care and because "the existence of probable cause will defeat an NIED claim."  Defs. Mot., ECF No. 59 at 25–26.  Defendants essentially ask the court to find that an expert is necessary to establish whether Defendant officers were negligent in pointing their guns at the heads of primary school aged children to ensure that they moved from one part of the house to another, so that officers could execute a search of their father's home.  And short of such a finding, Defendants alternatively ask the court to hold that such conduct is nevertheless not actionable as a NIED claim because the search was executed pursuant to a valid warrant.

---

[3] To the extent Plaintiffs allege NIED based on Defendants' failure to follow policies and procedures as set out in MPD General Orders, those claims will be dismissed for reasons previously explained.  *See Supra* III.B.

Defendants have not cited any cases holding that expert testimony is required or that probable cause defeats an NIED claim, in these circumstances as the court has described them. *Cf.* Defs. Mot., ECF No. 59 at 25–26 (citing cases). Given that there remain genuine disputes as to Defendant officers' conduct inside the home, Defendants are not entitled to judgment as a matter of law on this claim. The court will deny summary judgment as to Count I.

### IV.    CONCLUSION

For reasons set forth above, the court will GRANT in part and DENY in part Defendants' motion for summary judgment. ECF No. 59. An Order will accompany this Memorandum Opinion.

Date: September 1, 2023

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge